756 So.2d 79 (2000)
THE FLORIDA BAR, Complainant,
v.
Mark Evan FREDERICK, Respondent.
Nos. SC90007, SC90387.
Supreme Court of Florida.
May 4, 2000.
*80 John F. Harkness, Jr., Executive Director, John Anthony Boggs, Staff Counsel, and Olivia Paiva Klein, Bar Counsel, Tallahassee, Florida, for Complainant.
W.H.F. Wiltshire, Pensacola, Florida, for Respondent.
PER CURIAM.
Mark Evan Frederick petitions this Court to review a referee's report recommending that he be found guilty of violating several of the Rules Regulating the Florida Bar and suspended from the practice *81 of law for ninety-one days. We have jurisdiction. See art. V, § 15, Fla. Const.

I. FACTS

The Florida Bar filed two unrelated complaints against Frederick:

Case No. 90,007
Case number 90,007 arose from a dispute between Frederick and members of a class action suit he had represented. According to the Bar's complaint, fourteen people were originally expected to participate in the class action suit at $2000 each, for a grand total of $28,000 to be paid to Frederick. The Bar alleged that Frederick originally advised members of the class that $5000 of the $28,000 was to be placed in trust and used to pay costs, and that a written contingency fee contract later entered into on behalf of the class provided that $20,000 was a nonrefundable retainer; $8000 was a cost deposit; $13,100 had been paid to Frederick; and $14,900 was owed.
The Bar further alleged that only nine people ultimately participated in the class action suit, and those nine people paid Frederick an additional $4900 which, in addition to the $13,100 already paid, amounted to a total of $18,000 (i.e., $2000 each). The Bar alleged that members of the class at all times believed that the $2000 each had paid included all costs of the litigation, but that Frederick did not place any portion of the $18,000 into his trust account for payment of costs. The Bar alleged that instead, upon later withdrawing from representation, Frederick asserted that the $18,000 represented only his fees, and that he had paid costs of $5500 out of his own operating account. According to the Bar's complaint, Frederick accordingly refunded $12,500 to the class and had each of the nine members of the class sign the following release:
This release will acknowledge receipt of my file from MARK EVAN FREDERICK, P.A., Attorney at Law. We further release said attorney from any further liability in this matter and request that he not perform any more work in my file. We have expressed dissatisfaction with Attorney Mark Evan Frederick regarding his fees and he has offered to meet with us, he has written to us once, and talked to us twice, and we accept his voluntary offer of $12,500.00, to be paid to us within 2 days of his receipt of this release, as complete satisfaction of my fee dispute. Further, we agree to not write the Florida Bar and if we have already, we agree to voluntarily withdraw it. If the undersigned violates this Release agreement, the undersigned has been made aware that we can be sued for the recollection of these funds voluntarily paid to us.

(Emphasis added.) By reason of the foregoing, the Bar charged Frederick with violating Rules Regulating the Florida Bar 4-1.15(a) ("Clients' and Third Party Funds to be Held in Trust"); 4-8.4(d) ("A lawyer shall not ... engage in conduct in connection with the practice of law that is prejudicial to the administration of justice"); and 5-1.1(a) ("Nature of Money or Property Entrusted to Others").

Case No. 90,387
Case number 90,387 arose from Frederick's employment of a disciplinarily resigned attorney, William D. Barrow. According to the Bar's complaint, Barrow had direct contact with one of Frederick's clients, and Frederick was aware of, directed, and acquiesced to such contact. By reason of the foregoing, the Bar charged Frederick with violating Rules Regulating the Florida Bar 3-6.1(c) (1990) ("No suspended, resigned, or disbarred attorney shall have direct contact with any client"), and 4-5.3(a), (b), (c)(1), and (c)(2) ("Responsibilities Regarding Nonlawyer Assistants").

The Referee's Report
The two cases were consolidated, a referee was appointed, and a disciplinary hearing was held. As to case number 90,007, the referee ultimately found at length:

*82 1. Respondent met with a group of men who were anticipating bringing a class action suit against the U.S. Navy. At this meeting in Panama City, Respondent discussed with the group their claims against the Navy and also discussed with them his fees and costs. Initially it was believed that fourteen people would be named as plaintiffs. The financial arrangements were that each person would pay $2,000 and that $5,000 of this would go as a cost retainer.
2. Respondent memorialized this meeting and agreement by letter dated August 18, 1994.
3. On August 31, 1994, Respondent again met with the group, this meeting being held in Destin. At this meeting, Respondent had two of the group, Robert Jones and Sammy Barnes, acting on behalf of the entire group, execute a written agreement for representation.
4. The written agreement, which was a standard form for a contingency fee arrangement, was modified by Respondent who wrote the following terms on the form: "$20,000 nonrefundable retainer; $8,000 cost deposit. $13,100 received today; balance of $14,900 due by September 22, 1994." It was still assumed at this time that the plaintiffs would equal fourteen in number when their suit was filed.
5. At this meeting, Respondent told Robert Jones, one of the two signers for the group, that this contract provided the terms they had discussed at their Panama City meeting.
6. Ultimately, nine people, instead of the anticipated fourteen, participated in the litigation. Respondent was paid $18,000, in keeping with the $2,000 per person. None of this money was deposited into the Respondent's trust account to cover costs.
7. In a later meeting with the group at the Bay County Courthouse, Respondent agreed to proceed with the case as set forth in paragraph numbered six above, in spite of his earlier desire to have at least ten plaintiffs.
8. According to the testimony of the members of the group, which the referee finds convincing, Respondent never told them of his intentions to use the entire $18,000 as his attorney's fees. They still had the understanding that some of this money was to pay costs and expenses, and that this amount would be placed in, as they termed it, an escrow account.
9. On January 25, 1995, Respondent sent his paralegal, Tammy Tikell to a meeting with the nine group members, again in Panama City. At this meeting, Ms. Tikell had each of the group's members sign a straight contingency fee contract to meet what she understood to be a requirement for individual contracts in federal class action law suits.
10. At the time the clients signed the contract, no handwritten language was contained thereon.
11. Ms. Tikell later added language that indicated that the members acknowledged that their individual $2,000 payments made on September 24, 1994, were non-refundable retainers. All of the members of the group who testified at the hearing in this matter vehemently denied the presence of the handwritten notation when they signed the contract. The referee finds their testimony to be more credible than Ms. Tikell's.
12. It was always represented to the group by Respondent that a certain sum of their money would go to pay costs. This was clearly represented in Complainant's exhibits numbered A [Respondent's August 18, 1994 letter] and B [the written contingency fee contract], as well as in his conversations with the clients. At no time was their fee arrangement renegotiated.
13. Respondent failed to maintain any records by which he could establish specific costs incurred in this litigation.
14. In spite of testimony offered by Tammy Tikell that she mailed letters to *83 the clients concerning their delinquent standing on the issue of cost money, Respondent is unable to produce any documentation showing that the clients were billed for any outstanding fees, this in spite of an order to produce.
15. Due to health concerns, Respondent was preparing to withdraw from representation of certain federal litigation matters. In doing so, Respondent prepared letters to be sent to certain clients informing them of this decision.
16. Tammy Tikell, who at the time was in a salary dispute with Respondent, discovered a draft of a withdrawal from representation letter Respondent had prepared for this group of clients.
17. Tammy Tikell informed the group of Respondent's intentions to withdraw from representing them. She eventually showed them a copy of the draft.
18. As a result of seeing the draft, the group sent Respondent a letter demanding $15,000 of their money back or they would "file a Florida bar complaint and sue ... for legal malpractice."
19. Upon receiving the group's letter, Respondent replied by mail offering to refund $7,500.
20. After other negotiations, it was agreed that Respondent would refund the group $12,500.
21. Sammy Barnes, one of the spokespersons for the group[,] was informed by Respondent's secretary that before she could give them the $12,500 check, they would each have to sign a release.
22. The release prepared by Respondent stated the financial terms of their agreement and then provided that "... we agree to not write the Florida Bar and if we have already, we agree to voluntarily withdraw it."
23. The clients thought that they had to sign the release as it was prepared in order to get their money back.
24. The wording of the release and the accompanying wording on the check eventually picked up by the clients clearly show that the provision that the clients not contact The Florida Bar was a condition precedent to the money being refunded to the clients.
25. The clients had at this time made arrangements to retain another attorney to represent them in this matter, and the fee they were to pay her was to come from the money they received from Respondent.
(Record citations omitted.) As to case number 90,387, the referee ultimately found:
1. In late March 1996, Respondent employed William D. Barrow, a disciplinarily resigned attorney, to work in his office.
2. Despite knowing of Mr. Barrow's status with The Florida Bar, Respondent made no efforts to determine the permitted parameters of Mr. Barrow's services.
3. Respondent relied exclusively upon Mr. Barrow's representations to him of his conversations with Florida Bar representatives concerning what law office activities he was allowed to conduct.
4. Respondent allowed, and in fact directed William D. Barrow, a disciplinarily resigned attorney, to have direct contact with Mr. Simp McCorvey, a client.
5. The Florida Bar's exhibit numbered 1, which consists of a number of memoranda to the file of the client in question, documents in excess of ten times that Mr. Barrow had contact with the client without respondent being present. For the most part, these were telephone conversations, several being noted as having been taken at respondent's request.
6. William D. Barrow considered these conversations to be direct contact, as set forth in a memorandum dated April 30, 1996, wherein Mr. Barrow noted *84 to Respondent that he "would prefer, if at all possible, not to have any more person to person dealings with the man."
7. Respondent has contended from the beginning of this complaint being filed that direct contact means face to face meetings with clients and does not encompass telephone conversations such as Mr. Barrow had with the client. The referee agrees with the position of the Florida Bar that direct contact encompasses any unsupervised client contact whether such contact is in person or by use of telephone.
(Record citations omitted.) Based on these findings, the referee ultimately recommended that Frederick be found guilty as charged in case number 90,007, and guilty of violating rules 3-6.1 and 4-5.3(a) and (b) (but not guilty of violating rules 4-5.3(c)(1) and (c)(2)) in case number 90,387.
As to discipline, the referee found no mitigation, but in aggravation found that Frederick had been previously disciplined several times;[1] a pattern of misconduct; multiple cases; submission of false evidence, false statements, or other deceptive practices during the disciplinary process; refusal to acknowledge the wrongful nature of his conduct; and substantial experience in the practice of law. The referee ultimately recommended that Frederick be suspended from the practice of law for ninety-one days and thereafter until he proved rehabilitation (including the requirement that he attend at least one continuing legal education course on law office management that includes instruction on the keeping of time records, trust accounts, and payment of costs); be placed on probation thereafter for three years under the supervision of a member of the Bar (including the requirement that he provide periodic reports of his caseload and proof that he has established an acceptable method of keeping time records by entering into a contractual arrangement with Law Partners or a similarly acceptable organization approved by the Bar); pay into the Clients' Security Fund $5500 (the sum he retained from the class action); and pay the Bar's costs in the disciplinary proceeding ($8,282.86).

II. ANALYSIS

Frederick challenges both the guilt and the discipline recommended by the referee.

A. GUILT

As to guilt, Frederick challenges the referee's recommendations in both case number 90,007 and case number 90,387.

Case No. 90,007
In recommending that Frederick be found guilty of violating rules 4-1.15(a) ("Clients' and Third Party Funds to be Held in Trust") and 5-1.1(a) ("Nature of Money or Property Entrusted to Others"), the referee here found that Frederick had "failed to hold in trust, separate from his own property, funds paid him by clients for costs and expenses," and "used money entrusted to him by his clients for the purpose of covering costs and expenses, for other purposes, specifically for his fees, in spite of his employment agreement with his clients." In so finding, the referee relied in part upon negotiations preceding the written contingency fee contract between Frederick and his clients. Frederick argues that, in so doing, the referee fundamentally erred in violation of the parol evidence rule. We disagree.
As this Court recognized long ago, "[t]he general rule is familiar that parol evidence is inadmissible to contradict or vary the terms of a valid written instrument, but this rule applies only to the parties to the contract or their privies.... [T]he rule applies only to controversies between the parties themselves and those claiming under them, and between one of *85 the parties and a stranger the rule does not apply." Roof v. Chattanooga Wood Split Pulley Co., 36 Fla. 284, 295, 18 So. 597, 599 (1895) (emphasis added); accord Palmer v. R.S. Evans, Jacksonville, Inc., 81 So.2d 635, 637 (Fla.1955); Quarterman v. City of Jacksonville, 347 So.2d 1036, 1038 (Fla. 1st DCA 1977); see generally 24 Fla. Jur.2d Evidence and Witnesses § 446 (1995). As explained by one noted commentator:
The theory of the [parol evidence] rule is that the parties have determined that a particular document shall be made the sole embodiment of their legal act for certain legal purposes. Hence, so far as that effect and those purposes are concerned, they must be found in that writing and nowhere else, no matter who may desire to avail himself of it. But so far as other effects and purposes are concerned, the writing has not superseded their other conduct, nor other persons' conduct, and it may still be resorted to for any other purpose for which it is material, either by other persons or by themselves.
9 John Henry Wigmore, Evidence in Trials at Common Law § 2446 (James H. Chadbourn rev.1981) (citation omitted). As applied in the present case, the Bar was not a party to the written contract between Frederick and his clients, nor did it seek to alter the effects and purposes of that contract; rather, as a "stranger" to the contract, the Bar resorted to, among other things, conduct preceding the contract (i.e., parol evidence) for a separate effect and purpose for which that conduct was material-to wit: as evidence of Frederick's alleged professional misconduct. The parol evidence rule simply does not apply under these circumstances.[2]
Frederick also argues that the referee fundamentally erred by "ignoring the probative effect of a later oral agreement [at the Bay County Courthouse] which modified and eliminated the cost advance requirement of the written agreement and [Frederick] acted in reliance thereon." Significantly, however, the referee did not "ignore" the evidence on this issue, but merely rejected Frederick's testimony regarding same in favor of the clients' testimony. Specifically, as already quoted above, the referee found:
In a later meeting with the group at the Bay County Courthouse, Respondent agreed to proceed with the case... in spite of his earlier desire to have at least ten plaintiffs.... According to the testimony of the members of the *86 group, which the referee finds convincing, Respondent never told them of his intentions to use the entire $18,000 as his attorney's fees. They still had the understanding that some of this money was to pay costs and expenses, and that this amount would be placed in, as they termed it, an escrow account.
These findings are supported by competent, substantial evidence in the record, and we are therefore "precluded from reweighing the evidence and substituting [our] judgment for that of the referee." Florida Bar v. Lange, 711 So.2d 518, 520 n. 5 (Fla.1998) (quoting Florida Bar v. MacMillan, 600 So.2d 457, 459 (Fla.1992)). "The party contending that the referee's findings of fact and conclusions as to guilt are erroneous carries the burden of demonstrating that there is no evidence in the record to support those findings or that the record evidence clearly contradicts the conclusions." Lange, 711 So.2d at 520 n. 5. Such is not the case here, and Frederick has not met this burden by simply repeating testimony and arguments thereon that the referee heard and rejected below. As this Court has held, "a party does not meet the burden of showing that a referee's findings are erroneous simply by pointing to contradictory evidence where there is also competent, substantial evidence in the record that supports the referee's findings." Florida Bar v. Glick, 693 So.2d 550, 552 (Fla.1997).
Next, in recommending that Frederick be found guilty of violating rule 4-8.4(d) ("A lawyer shall not ... engage in conduct in connection with the practice of law that is prejudicial to the administration of justice"), the referee here found that Frederick had "requir[ed] as a condition precedent to his clients receiving the funds agreed to in their release ... that they agree to either not contact the Florida Bar with any complaints concerning him, or if they had already done so, that they would withdraw the same." This Court has cautioned that "any such agreement is not enforceable," Florida Bar v. Fitzgerald, 541 So.2d 602, 605 (Fla.1989), and Frederick concedes that including such a requirement in the release was "ill-advised." He nevertheless asserts that
to be guilty of a violation [of rule 4-8.4(d) ], Frederick must have [had] knowledge that he was guilty of improperly using his clients' trust money and was attempting to cover up this misconduct to avoid the consequences. [Frederick has] established, however, that no misconduct or trust violation occurred, because the $18,000 was a fee earned as a matter of law....
This assertion directly contradicts the referee's factual finding already quoted above that "[i]t was always represented to the group by Respondent that a certain sum of their money would go to pay costs. This was clearly represented in Complainant's exhibits numbered A [Respondent's August 18, 1994 letter] and B [the written contingency fee contract], as well as in his conversations with the clients. At no time was their fee arrangement renegotiated." Once again, this finding is supported by competent, substantial evidence in the record, and Frederick has neither met his burden on review nor established to the contrary "that no misconduct or trust violation occurred" by simply pointing to contradictory evidence and repeating testimony and arguments thereon that the referee heard and rejected below. See Lange, 711 So.2d at 520 n. 5; Glick, 693 So.2d at 552.
Frederick alternatively argues that rule 4-8.4(d) does not apply here, asserting that it was "designed to prohibit lawyers from engaging in racial, sexual or other discriminatory conduct against any other participant in a judicial proceeding administering justice." We reject such a narrow reading of rule 4-8.4(d), which provides in full:
A lawyer shall not ... engage in conduct in connection with the practice of law that is prejudicial to the administration of justice, including to knowingly, or through callous indifference, disparage, humiliate, or discriminate against litigants, *87 jurors, witnesses, court personnel, or other lawyers on any basis, including, but not limited to, on account of race, ethnicity, gender, religion, national origin, disability, marital status, sexual orientation, age, socioeconomic status, employment, or physical characteristic.
In amending rule 4-8.4(d) to add the language underlined above, this Court was responding to "a number of problems faced by minorities and women in the legal profession ... [and] the need for specific rules prohibiting discriminatory practices by members of the Bar." Florida Bar re Amendments to Rules Regulating The Florida Bar, 624 So.2d 720, 721 (Fla.1993). Significantly, however, the amendment did not constrict the rule to address only these concerns; rather, it broadened the rule to include them. Indeed, in adopting the amendment, this Court emphasized that "the amendment should preclude any conduct prejudicial to the administration of justice." Id.
Furthermore, contrary to Frederick's suggestion that rule 4-8.4(d) applies only to conduct "in a judicial proceeding," the rule itself more broadly provides that it applies to "conduct in connection with the practice of law." This Court has recognized that "[w]hile conduct that actually affects a given proceeding may be prejudicial to the administration of justice, conduct that prejudices our system of justice as a whole also is encompassed by rule 4-8.4(d)." Florida Bar v. Machin, 635 So.2d 938, 939-40 (Fla.1994). This certainly includes Frederick's coercive dealings with his clients in an effort to preemptively thwart the Bar's disciplinary involvement in this case. See, e.g., Florida Bar v. Black, 602 So.2d 1298, 1298 (Fla.1992) (disciplining attorney for violating rule 4-8.4(d) and other disciplinary rules in selfserving loan transaction with client); Florida Bar v. Perlmutter, 582 So.2d 616, 617 (Fla.1991) (disciplining attorney for violating rule 4-8.4(d) and other disciplinary rules by, among other things, "threatening to retaliate against citizens who file complaints with The Florida Bar"). We accordingly reject Frederick's argument in this regard and hold that his conduct in discouraging the Bar's involvement as a condition of the release falls within the "conduct in connection with the practice of law that is prejudicial to the administration of justice" broadly prohibited by rule 4-8.4(d).

Case No. 90,387
In recommending that Frederick be found guilty of violating former rule 3-6.1(c) ("No suspended, resigned, or disbarred attorney shall have direct contact with any client"), the referee here found that Frederick had "allowed and in fact directed William D. Barrow, a disciplinarily resigned attorney, to have direct contact [i.e., telephone conversations] with a client." In so finding, the referee explicitly rejected Frederick's argument that "direct contact means face to face meetings with clients and does not encompass telephone conversations such as Mr. Barrow had with the client," agreeing with the Bar's position that "direct contact encompasses any unsupervised client contact whether such contact is in person or by use of telephone."
Frederick now argues that rule 3-6.1(c) is overly broad and vague insofar as it does not define what "direct contact" is, urging that such "direct contact" does not include telephone conversations like those at issue here. We again disagree.
At the time of the conduct in question, rule 3-6.1(c) provided in full that "[n]o suspended, resigned, or disbarred attorney shall have direct contact with any client or receive, disburse, or otherwise handle trust funds or property." Frederick cites no authority for his proposition that "direct contact" in the rule encompasses only face-to-face meetings. To the contrary, in Florida Bar v. Hunt, 429 So.2d 1201, 1203-04 (Fla.1983), this Court adopted an uncontested referee's report recommending that an attorney be disciplined for, among other things, permitting a disbarred *88 attorney to prepare pleadings and have "direct contact" with clients, where such "direct contact" consisted of written correspondence with clients in several cases. While Hunt did not involve rule 3-6.1(c),[3] it does stand for the proposition that written correspondence amounts to "direct contact" in this context; a fortiori, telephone conversations amount to "direct contact" as well.[4] We accordingly reject Frederick's challenge to rule 3-6.1(c).[5] Frederick does not contest the referee's related recommendation that he be found guilty of violating rules 4-5.3(a) and (b) ("Responsibilities Regarding Nonlawyer Assistants").
We accordingly reject all of Frederick's arguments regarding guilt, and approve all of the referee's recommendations of guilt in this case.

B. DISCIPLINE

In keeping with his argument that virtually all of the referee's recommendations of guilt should be rejected, Frederick generally argues that "the recommended discipline also should be entirely rejected." However, as discussed at length above, we approve all of the referee's recommendations of guilt in this case. Thus, Frederick's general argument against the recommended discipline, which completely depends on a contrary result as to guilt, must accordingly fail.
Frederick more specifically argues that this Court should reject that portion of the referee's recommendation as to discipline that he "should pay into the Florida Bar's Client Security Fund ["the Fund"[6]] $5,500.00, which is the sum he retained from the representation of the class action lawsuit [i.e., $18,000 minus the $12,500 he refunded] that resulted in the majority of the Bar's allegations against him." Frederick argues that this portion of the recommended discipline is "grossly unjust ... [and] constitutes a forfeiture and unjust enrichment" because he "had advanced substantial costs and expenses" on behalf of his clients. Frederick's point is well taken.
In the disciplinary proceedings below, Bar counsel urged in closing argument:
[W]e are seeking restitution of fifty-five hundred dollars to the clients or if the court finds that there have been costs expended on behalf of these clients even though the Respondent has been unable to show a dime of cost, we would ask that you pay the cost to the client security fund if the court feels that it would *89 be unjust enrichment to give the money back to the clients.... [W]e would ask that either the money be refunded to the clients or paid to the client's security fund, to the general fund.
(Emphasis added.) Given this option, that the referee here ultimately recommended payment into the Fund (as opposed to restitution) implicitly suggests that the referee found the Bar's stated alternative that "it would be unjust enrichment to give the money back to the clients" and "there have been costs expended on behalf of these clients," despite the referee's explicit finding here that Frederick "failed to maintain any records by which he could establish specific costs incurred in this litigation... [and] is unable to produce any documentation showing that the clients were billed for any outstanding fees, this in spite of an order to produce." (Record citation omitted.) In other words, the referee here was aware that restitution was an urged option; that he instead recommended payment into the Fund suggests that he intended the payment not as restitution, but as something more akin to a fine.
Significantly, however, "there is no authority to impose a fine as a condition of discipline." Florida Bar v. Greene, 589 So.2d 281, 282 (Fla.1991); see also R. Regulating Fla. Bar 3-5.1 (types of discipline authorized do not include imposition of fine). Furthermore, in Florida Bar v. Rogowski, 399 So.2d 1390, 1391 (Fla.1981), this Court rejected a referee's recommendation that the subject attorney pay money into the Fund because, as here, "no funds were paid out of the [F]und," holding that "[t]here is no authority for this Court in a disciplinary proceeding to require a payment that is not for restitution or the payment of costs." As neither of these two ends are fulfilled by the proposed discipline at issue, we reject the referee's recommendation that Frederick pay $5500 into the Fund.
However, given the number and nature of Frederick's offenses, his disciplinary history, and the extensive aggravation at issue, we approve all remaining aspects of the referee's recommended discipline as being reasonably supported by existing case law. See Florida Bar v. Fredericks, 731 So.2d 1249, 1254 (Fla. 1999). As cited by the Bar, similar cases involving trust account violations or conduct prejudicial to the administration of justice or both have resulted in suspensions of ninety-one days or more. See Florida Bar v. Adler, 589 So.2d 899 (Fla. 1991) (eighteen-month suspension for trust account violations); Florida Bar v. Burke, 578 So.2d 1099 (Fla.1991) (ninety-one day suspension for trust account violations and engaging in conduct prejudicial to the administration of justice and conduct adversely reflecting on fitness to practice law); see also Florida Bar v. Penn, 421 So.2d 497 (Fla.1982) (six-month suspension for improperly retaining legal fee and improperly requiring client to sign release). Moreover, as generally relevant in the present case, "[t]his Court has consistently held that misuse of trust account funds is among the most serious infractions a lawyer can commit," Florida Bar v. Dubow, 636 So.2d 1287, 1289 (Fla.1994), and "[t]he Court deals more harshly with cumulative misconduct than it does with isolated misconduct." Florida Bar v. Bern, 425 So.2d 526, 528 (Fla.1982).

III. CONCLUSION

Based on the foregoing analysis, Mark Evan Frederick is hereby suspended from the practice of law for ninety-one days and thereafter until he proves rehabilitation (including the requirement that he attend at least one continuing legal education course on law office management that includes instruction on the keeping of time records, trust accounts, and payment of costs). Following his suspension, Frederick shall be placed on probation under the supervision of a member of the Bar for three years (including the requirement that he provide periodic reports of his caseload and proof that he has established *90 an acceptable method of keeping time records by entering into a contractual arrangement with Law Partners or a similarly acceptable organization approved by the Bar). The suspension will be effective thirty days from the filing of this opinion so that Frederick can close out his practice and protect the interests of existing clients. If Frederick notifies this Court in writing that he is no longer practicing and does not need the thirty days to protect existing clients, this Court will enter an order making the suspension effective immediately. Frederick shall accept no new business from the date this opinion is filed until the suspension is completed. Judgment is entered for The Florida Bar, 650 Apalachee Parkway, Tallahassee, Florida 32399, for recovery of costs from Mark Evan Frederick in the amount of $8,282.86, for which sum let execution issue.
It is so ordered.
NOTES
[1] Specifically, the referee found that Frederick had been privately reprimanded twice in 1990, admonished in 1993, and publicly reprimanded in 1996. See Florida Bar v. Frederick, 678 So.2d 340 (Fla.1996).
[2] In holding that the parol evidence rule does not apply to the disciplinary action brought by the Bar seeking disciplinary measures against Frederick, we recognize that it would ordinarily apply in a civil action between Frederick and his clients seeking enforcement of the fee contract. Insofar as both types of actions can involve monetary sanctions or awards, we perceive a potential for abuse of the disciplinary process. Specifically, aggrieved clients in contractual fee disputes with their attorneys could "get around" the parol evidence rule simply by seeking restitution through a disciplinary action, as opposed to monetary relief through a civil action. The same would not be true for aggrieved attorneys-the only recourse they would have in a contractual fee dispute with their clients would be through a civil action, where the parol evidence rule would ordinarily apply. Such unequal footing between attorneys and clients in contractual fee disputes appears to be at least unfair and at most unconscionable, especially considering that attorney-client fee contracts in Florida are preferred, if not required, to be in writing. See, e.g., R. Regulating Fla. Bar 4-1.5(e)-(f). Moreover, that the parol evidence rule could be so easily avoided by aggrieved clients as described above is at odds with the principle that the parol evidence rule is not simply a rule of evidence but, to the contrary, a fundamental rule of substantive law. See Schwartz v. Zaconick, 68 So.2d 173, 175 (Fla. 1953); Knabb v. Reconstruction Finance Corp., 144 Fla. 110, 130-31, 197 So. 707, 715 (1940).

We stress that, in making the above observations, we are by no means suggesting that the clients in the present case intentionally attempted to avoid the parol evidence rule by pursuing a disciplinary, as opposed to civil, action against Frederick. However, we do recognize the potential for abuse in this context, and therefore direct the Bar to craft and submit to this Court a proposed rule addressing these concerns.
[3] Rather, Hunt involved predecessor Disciplinary Rule 3-101(A), which was applicable at the time and provided that "[a] lawyer shall not aid a non-lawyer in the unauthorized practice of law." See Florida Bar v. Hunt, 429 So.2d 1201, 1204 (Fla.1983).
[4] We note that this treatment of the term "direct contact" is consistent with our treatment of that term elsewhere in the rules. Specifically, in addressing solicitation of prospective clients through "direct contact," Rule of Professional Conduct 4-7.4(a) explicitly provides that "[t]he term `solicit' includes contact in person, by telephone, telegraph, or facsimile, or by other communication directed to a specific recipient and includes any written form of communication directed to a specific recipient."
[5] Rule 3-6.1(c) has recently been amended and renumbered as rule 3-6.1(d), which provides in full that "[n]o employee shall have direct contact with any client. Direct client contact does not include the participation of the employee as an observer in any meeting, hearing, or interaction between a supervising attorney and a client." This amended rule was not in effect at the time of Frederick's conduct at issue in the present case. Even assuming otherwise, the amended rule does not change our analysis.
[6] Through the Clients' Security Fund, "[t]he board of governors may provide monetary relief to persons who suffer reimbursable losses as a result of misappropriation, embezzlement, or other wrongful taking or conversion by a member of The Florida Bar of money or other property that comes into the member's possession or control, all in accordance with chapter 7." R. Regulating Fla. Bar 1-8.4; see also ch. 7, Rules Regulating Fla. Bar (setting forth the rules and regulations of the Clients' Security Fund).