PER CURIAM.
 

 We have for review a referee’s report recommending that William Sumner Scott be found guilty of professional misconduct and suspended from the practice of law for eighteen months. We have jurisdiction.
 
 See
 
 art. V, § 15, Fla. Const. We approve the referee’s findings of fact and recommendations regarding guilt. But we disapprove the sanction recommendation and instead impose a three-year suspension.
 

 FACTS
 

 The referee found that The Florida Bar proved the following facts by clear and convincing evidence.
 

 
 *311
 
 In 1995, Scott represented Richard Mas-eri’s company, Private Research, Inc., in a suit for an injunction filed by the Commodity Futures Trading Commission (CFTC) in the United States District Court for the Southern District of
 
 Florida
 
 — Commodity
 
 Futures Trading Commission v. Maseri,
 
 No. 95-6970-CIV-DAVIS, 1995 WL 17144922 (S.D. Fla. complaint filed Oct. 16, 1995). The CFTC complaint alleged that Maseri and Private Research defrauded customers, converted customer funds, and violated the registration provisions of the Commodity Exchange Act (the Act), 7 U.S.C. §§ l-27f (1994), and CFTC Regulations, 17 C.F.R. §§ 1-199 (1995). The court issued preliminary injunctive orders and, in 1997, made them permanent. The orders prohibited Maseri and Private Research from contracting for the sale of any commodity; acting directly or indirectly as a commodities trading advisor (CTA) or commodities pooling operator (CPO) without being registered as such; and engaging in any fraudulent activities while acting as a CTA or CPO.
 

 In the summer of 1998, Maseri advertised for investors for a commodities brokerage venture. Steven Frankel, who .was unaware of Maseri’s previous history, responded to the advertisement. In July 1998, Maseri hired Scott to represent him in negotiations with Frankel aimed at establishing a forex brokerage company.
 
 [1]
 
 In August 1998, Maseri and Frankel created International Currency Exchange Corporation, a Nevada corporation, later renamed Intercontinental Currency Exchange Corporation (ICEC). They each owned a fifty-percent share of the company. They met, along with Scott, on August 4, 1998, to sign the stockholders’ agreement. Before Maseri arrived for the meeting, Frankel questioned Scott about Maseri. Scott failed to tell Frankel about CFTC’s suit against Maseri, the court order prohibiting Maseri from entering into certain business transactions, or Maseri’s criminal history, even though this information was public and nonconfidential. During the course of their conversation, Scott made statements to the effect that Maseri was “an honest man.”
 

 During the August 4 meeting, Scott agreed to represent ICEC. At a minimum, Scott agreed to prepare new account form documents for ICEC. Frankel put up $5000 in equity for the venture and loaned ICEC $180,000.
 

 In November 1998, the federal court entered a final order of judgment against Maseri in the
 
 Maseri
 
 case. Prudential Securities, Inc. (Prudential), as a holder of ICEC assets, filed an interpleader action against CFTC in the United States District Court for the Southern .District of Florida and notified ICEC that its assets would be frozen until released,,by the court.
 
 Prudential Securities, Inc. v. Commodity Futures Trading Commission,
 
 No. 98-8891-CIV-MIDDLEBROOKS (S.D.Fla.). Maseri, as ICEC’s president and chief operating officer, hired Scott to attempt to unfreeze ICEC’s assets.
 

 Frankel was unaware of these events until December 15, 1998. On that date, because he was unable to contact Maseri by telephone, he drove to the office and discovered that law enforcement officers had raided ICEC. At that point, Maseri told Frankel about his problems with the CFTC and referred him to Scott.
 

 Frankel contacted Scott, who told him that he had been retained to represent ICEC and, since Frankel had loaned
 
 *312
 
 ICEC money, he would be representing Frankel in getting his funds released to him. On December 18, 1998, Frankel entered into a retainer agreement with Scott in which Scott agreed “to attempt to have the accounts which hold your funds at Prudential released.”
 
 [2]
 
 Three days later, Frankel signed an addendum to his retainer agreement with Scott in which “Frankel, not as a Director, but as a lender to ICEC,” ratified, adopted, and approved his earlier hiring of Scott.
 

 ICEC also maintained accounts at Donaldson, Luftkin & Jenrette (DLJ). These accounts were controlled by Dreyfus Service Corporation (Dreyfus). In 1999, Dreyfus, like Prudential, filed an inter-pleader action in the United States District Court for the Southern District of Florida.
 
 Dreyfus Service Corp. v. Intercont’l Currency Exch. Corp.,
 
 No. 99-6151-CIV-DAVIS (S.D.Fla.). Scott, on behalf of ICEC investor' Moresea, Ltd., filed a counterclaim against Dreyfus and a third-party complaint against DLJ, alleging that ICEC had conducted business in an illegal manner.
 

 On January 6,1999, Scott filed a petition for emergency relief on behalf of ICEC in the
 
 Prudential
 
 interpleader action. The petition included a cross-claim against Prudential on behalf of ICEC investors.
 

 On January 15, 1999, the federal district court supplemented the final judgment in the
 
 Commodity Futures Trading Commission v. Maseri
 
 case to make ICEC subject to receivership. As a result, ICEC’s assets went into receivership. The receiver notified Prudential that ICEC’s assets were to be turned over to satisfy the judgment.
 

 On February 9,1999, on behalf of ICEC investor Investcan, Ltd., Scott filed an answer and a counterclaim against Prudential, alleging that Maseri and ICEC had operated in violation of Florida law. Prudential wrote to Scott on February 12 and 19, 1999, to object to his dual representation of ICEC and its investors on the basis of conflicts of interest. Despite Prudential’s objection, Scott filed a counterclaim on February 24, 1999, on behalf of ICEC investors Roger Lennon and The Lennon Trust.
 

 The court in
 
 Prudential
 
 dismissed the ICEC investors’ cross-claim on March 17, the Investcan cross-claim on April 13, and the Lennon counterclaim on April 19. Scott filed a first amended counterclaim against Prudential on behalf of ICEC investors on April 23; that counterclaim also asserted unlawful conduct by ICEC.
 

 The court dismissed the
 
 Dreyfus
 
 ease on June 14, 2000, and the
 
 Prudential
 
 case on January 4, 2001. Prudential released the ICEC funds to the receiver. Scott tried to reopen the
 
 Prudential
 
 case over a year later, on January 18, 2002, and to file a cross-claim against his former client Frankel on behalf of ICEC and its investors/depositors for breach of contract, legal malpractice, and fraud. The court denied his motion on February 4, 2002. That same day, Scott filed a motion on behalf of Investcan, seeking joinder to the cross-claim against Frankel. On February 13, Scott filed a motion to reconsider reopening the
 
 Prudential
 
 case on behalf of ICEC and all persons who opened an account with ICEC.
 

 Meanwhile, on January 29, 2002, the federal district court in
 
 Commodity Futures Trading Commission v. Maseri
 
 issued an order discharging the receiver and grant
 
 *313
 
 ing the receiver’s final report of distribution. On February 5, 2002, Scott filed a motion for reconsideration in that case on behalf of ICEC to contest the order of distribution. On February 19, Scott wrote to Frankel and Maseri, urging them to appeal the court’s order of discharge and demanding a retainer for legal fees to represent ICEC in an appeal.
 

 On February 20, 2002, Frankel demanded that Scott cease representing ICEC. Five days later, on February 25, 2002, Scott wrote to Frankel and Maseri, claiming that “no impasse of ICEC Nev[ada] management exists in regard to this case because both of you agreed for our firm to obtain recovery of the ICEC Nev[ada] deposits without regard to where they were located. We will keep you advised of developments.”
 

 On February 26, 2002, Frankel filed a motion to disqualify Scott on the basis of a conflict of interest. Scott wrote to Frankel on March 7, 2002, through Frankel’s attorney, stating, “ICEC Nev[ada] depositors have a superior right to the proceeds taken from ICEC Nev[ada] to pay the fees and costs of the Receiver than does Mr. Frankel either as shareholder or lender to ICEC Nev[ada],” and affording Frankel the “opportunity to respond to the proposed appeal by ICEC Nev[ada] of the order that discharged the receiver.”
 

 On April 22, 2002, Scott filed suit against Frankel and Maseri, on behalf of ICEC investor Investcan, in the United States District Court for the Southern District of Florida, asserting Investcan’s right to a return of its funds.
 
 Investcan Int’l, Ltd. v. Frankel,
 
 No. 02-60565-CIV-MIDDLEBROOKS (S.D. Fla. complaint filed Apr. 22, 2002).
 

 The court denied Scott’s motion for reconsideration in
 
 Prudential
 
 on May 24, 2002, noting
 

 a serious question as to ICEC’s putative counsel’s ability to represent ICEC in this matter.... This raises conflict issues .... The fact appears to be that
 
 at this date,
 
 Mr. Scott
 
 has
 
 represented Mr. Frankel in his individual capacity, in an attempt to get back monies Mr. Scott apparently now seeks on behalf of another client.
 

 Scott appealed the order. The Eleventh Circuit Court of Appeals affirmed.
 
 Moresea, Ltd. v. Prudential,
 
 No. 02-13523-JJ (11th Cir.).
 

 On July 3, 2002, Scott amended the In-vestcan complaint to allege that Frankel and Maseri failed to ensure that ICEC operated legally and thus defrauded plaintiffs of their money. The court disqualified Scott on October 4, 2002, on the basis of a conflict of interest in violation of Rule Regulating the Florida Bar 4-1.9. That decision was affirmed by the Eleventh Circuit Court of Appeals on March 28, 2003.
 
 Investcan Int’l, Ltd. v. Frankel,
 
 65 Fed. Appx. 715 (11th Cir.2003).
 

 Based on the factual findings, the referee recommends that Scott be found guilty of violating Rules Regulating the Florida Bar 4-4.1(a) (prohibiting lawyer from making false statement of material fact or law to third party in course of representing client) — one count; 4-1.7(a) (1993) (prohibiting lawyer from representing client if representation will be directly adverse to interests of another client unless lawyer reasonably believes representation will not adversely affect lawyer’s responsibilities to and relationship with other client and each client consents after consultation) — five counts; 4-1.9(a) (1993) (prohibiting lawyer who formerly represented client from representing another person in same or substantially related matter in which that person’s interests are materially adverse to interests of former client unless former client consents after consultation)-six
 
 *314
 
 counts; 4 — 1.16(a)(1) (1993) (prohibiting lawyer from representing client or requiring lawyer to withdraw where representation will result in violation of Rules of Professional Conduct or law) — seven counts; and 4-8.4(c) (prohibiting lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation)— one count.
 

 The referee recommends that Scott be suspended for eighteen months and taxed with the Bar’s costs. In recommending the eighteen-month suspension, the referee considered two mitigating factors — the absence of a prior disciplinary record and Scott’s age (seventy). The referee found no aggravating factors. In recommending an eighteen-month suspension, the referee did not identify the particular Florida Standards for Imposing Lawyer Sanctions on which he relied. Neither did he cite to any previous cases involving similar fact patterns in which this Court imposed eighteen-month suspensions.
 

 Scott petitioned for review of the referee’s report. He argues that the Bar’s complaint , should have .been dismissed as barred by the statute of limitations for Bar disciplinary proceedings; Scott was not obligated to tell Frankel about Maseri’s criminal history or legal problems with the CFTC; the referee’s finding that he misled Frankel was unsupported; the referee’s finding that he represented Frankel was unsupported and Frankel had waived any real or potential conflict of interest; and Scott’s duty to protect the public took precedence over his duty to maintain client confidentiality or to decline the representation of a client where a conflict of interest exists or is likely to arise. The Bar filed a cross^petition, seeking review of the sanction recommendation. The Bar argues that a three-year suspension is the appropriate sanction for the proven misconduct.
 

 ANALYSIS
 

 Scott previously raised the statute-of-limitations issue in a motion to dismiss filed in this Court. The Court rejected Scott’s statute-of-limitations argument and denied the motion to dismiss. We will not now revisit this issue, which we have previously determined adversely to Scott.
 

 Scott takes issue with the referee’s finding that Scott misled Frankel by representing that Maseri was an honest man. Scott argues that he had no duty to advise Frankel of public, nonconfidential information about Maseri: The referee’s finding in this regard is supported by competent, substantial evidence. Critically, if a referee’s findings of fact are supported by competent, substantial evidence in the record, the Court will not reweigh the evidence and substitute its judgment for that of the referee.
 
 Fla. Bar v. Frederick,
 
 756 So.2d 79, 86 (Fla.2000);
 
 see also Fla. Bar v. Jordan,
 
 705 So.2d 1387, 1390 (Fla.1998).
 

 In this instance, the referee found that Scott’s action in telling Frankel that Maseri was an “honest man” triggered a duty on his part to also reveal to Frankel the negative information he had concerning Maseri that could have impacted Frankel’s decision to go into business with Maseri. This finding is also supported by the record. Frankel, testifying about his conversation with Scott at the August 4, 1998, meeting, stated: “I asked him what he knew of him, and he indicated to me that Mr. Maseri had never lied to him, that he was an honest man, that he had never lost any money with him, and generally he left me feeling very good about him.” He further testified that Scott did not tell him anything negative about Maseri during their conversation and that if Scott had told him anything negative, specifically about the public nonconfidential informa
 
 *315
 
 tion Scott had about Maseri,- Frankel would have gotten up and left.
 

 More importantly, Scott admitted that his intent was to convince Frankel that Maseri was an honest man so as to ensure that Frankel proceeded with the proposed business deal. Concerning his motivation in telling Frankel that Maseri had never lied to him, Scott testified:
 

 Q Isn’t it true that in response to Mr. Frankel’s questions, you told him that Maseri had never lied or cheated you because you wanted Frankel to infer that Maseri was an honest man?
 

 A I gave a deposition and acknowledged that. When he started asking his questions, my goal was to preserve the déal. I already knew that in the agreement there was no representation of past litigation or regulation history. I already knew and had discussions with Maseri about what had he disclosed to Frankel and what he had not.
 

 I felt that at a closing that had been going on and negotiations back and forth for seven or eight days, for those questions to come up, I felt blindsided and as though the guy was trying to make me personally responsible for his problems instead of serving as his own lawyer, which I told him at the outset he had to do, and I told him — I thought I gave him plenty of notice that there was something there for him to worry about when I told him he ought to go get his own lawyer. You know, you can only take a cripple so far.
 

 Q Do I understand you correctly to have just said that yes, you wanted him to infer that Maseri was an honest man because you didn’t want the deal to get blown?
 

 A That is true.
 

 Scott also admitted that if the deal had been “blown,” he would not have been able to look forward to earning any fees from the ICEC venture.
 

 The referee’s finding that Scott represented Frankel is also supported by competent, substantial evidence in the record. The Bar introduced two retainer agreements, dated December 18 and 21, 1998, into evidence. The December 18 agreement states: “After my explanation to you of the existence of potential conflicts of interests among the depositors, you have requested
 
 that our firm represent you
 
 in the limited capacity to attempt to have the accounts which hold your funds at Prudential released.” (Emphasis added.) In the December 21 “Addendum to Retainer Agreement,” Frankel “consents, ratifies, and approves the ernployment of The Scott Law Firm, P.A. (the ‘Firm’) upon the terms outlined above.”
 

 In addition, both Scott and Frankel testified concerning Scott’s representation. When discussing the December 18 and 21 retainer agreements, Scott stated: “I also believed that I needed to get [a] retainer from him, which I
 
 now
 
 prefer to characterize as a waiver.” (Emphasis added.) The clear implication of this statement is that Scott himself -viewed the documents as retainers at the time he sent them to Frankel.
 

 •We reject Scott’s argument that' it was permissible for him to represent the ICEC investors despite the conflicts presented by his representation under some kind of duty-to-the-public exception. No such exception exists. To the-extent that ICEC investors wanted to pursue claims against Scott’s past or present clients with interests adverse to theirs, Scott should have referred them to other counsel, someone without a disqualifying conflict.
 

 We next address the referee’s guilt recommendations. The Court has repeatedly stated that the referee’s factual findings must be sufficient under the appli
 
 *316
 
 cable rules to support the recommendations as to guilt.
 
 See Fla. Bar v. Shoureas,
 
 913 So.2d 554, 557-58 (Fla.2005). Scott argues that the referee’s guilt recommendations on the conflict-of-interest issue are unsupported by the factual findings. His argument fails.
 

 An attorney engages in unethical conduct when he undertakes a representation when he either knows or should know of a conflict of interest prohibiting the representation.
 
 Fla. Bar v. Cosnow,
 
 797 So.2d 1255, 1257 (Fla.2001). The referee recommends that Scott be found guilty of violating Rules Regulating the Florida Bar 4-1.7(a), 4-1.9(a), and 4-1.16(a)(1) for his conflict-of-interest conduct in this case.
 

 Rule 4-1.7(a) provides that an attorney “shall not represent a client if the representation of that client will be directly adverse to the interests of another client” unless: (1) the lawyer reasonably believes the representation will not adversely affect the lawyer’s responsibilities to and relationship with the other client; and (2) each client consents after consultation.
 

 Rule 4-1.9(a) provides that a lawyer who formerly represented a client shall not “represent another person in the same or a substantially related matter in which that person’s interests are materially adverse to the interests of the former client unless the former client consents after consultation.”
 

 Rule 4-1.16(a)(1) provides that a lawyer shall not represent a client or shall withdraw where “the representation will result in violation of the Rules of Professional Conduct or law.”
 

 Scott represented, either seriatim or in conjunction: Maseri’s company, Private Research, in the
 
 Maseri
 
 case; Maseri in business negotiations with Frankel; ICEC (owned in equal parts by Maseri and Frankel) in the preparation of certain forms and in attempts to have ICEC’s assets unfrozen; Frankel, individually, as the maker of a loan to ICEC, for the recovery of the money Frankel loaned to ICEC; and individual ICEC investors, for recovery of the money they invested with ICEC and in a lawsuit for fraud against Maseri and Frankel. All of the representations undertaken by Scott after the creation of ICEC involved claims for ICEC’s assets in one way or another. The interests of ICEC, Maseri, Frankel, and the individual ICEC investors were all directly adverse to one another because all had claims to the same pool of money.
 

 Furthermore, even if the documents Frankel signed on December 18 and 21, 1998, were waivers of conflict rather than retainer agreements, as Scott argues, Frankel’s waiver would have been ineffective. Some kinds of conflicts of interest cannot be waived by a client. For example, in
 
 Florida Bar v. Feige,
 
 596 So.2d 438, 434 (Fla.1992), Feige represented himself and his client in a suit by his client’s ex-husband for the return of alimony payments made after Feige’s client had remarried. Feige had not represented the client in the divorce proceedings, but was aware of the provision in the couple’s marital settlement agreement requiring the ex-husband to pay alimony until the ex-wife, Feige’s client, died or remarried. His client was aware of the conflict in Feige’s representing himself and her and agreed to waive the conflict. This Court held that the conflict was the type that could not be waived and suspended him for two years.
 

 The conflicts of interest in this case were as directly adverse as those in
 
 Feige
 
 and equally unwaivable. Even if the conflicts had been waivable, Frankel’s waiver would have been, at best, void or voidable. At the time Frankel signed the retainer agreements, he was unaware of the severity of the conflict. Frankel testified that he
 
 *317
 
 believed that his and everyone else’s money was intact, just frozen, when he retained Scott. He did not discover that most of the money was gone until much later.
 

 Thus, the referee’s findings more than amply support the referee’s recommendations of guilt as to the conflict-of-interest claims, and accordingly, we approve these guilt recommendations.
 

 Scott also argues that the recommendation that he be found guilty of a misrepresentation is unsupported by the factual findings. We reject this argument as well. The referee’s findings adequately support his recommendation that Scott be found guilty of violating rules 4-4.1 (a) (prohibiting lawyer from making false statement of material fact or law to third person in course of representing a client) and 4-8.4(c) (prohibiting lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). The referee found that Scott made a misrepresentation to Frankel when he told Frankel that Maseri had never lied to him, indicating that Maseri was an honest man. The referee also found that Scott failed to tell Frankel about CFTC’s suit against Maseri, the court order prohibiting Maseri from entering into certain business transactions, or Maseri’s criminal history, even though this information was public and nonconfi-dential. The combination of the two circumstances constituted a misrepresentation. These factual findings are sufficient to support the referee’s recommendations that Scott be found guilty of violating rules 4-4.1(a) and 4-8.4(c).
 

 We next consider the appropriate sanction for Scott’s misconduct. In reviewing a referee’s recommended discipline, the Court’s scope of review is broader than that afforded to the referee’s findings of fact because ultimately it is the Court’s responsibility to order the appropriate sanction.
 
 See Fla. Bar v. Anderson,
 
 538 So.2d 852, 854 (Fla.1989);
 
 see also
 
 art. V, 15, Fla. Const. However, generally speaking, the Court will not second-guess the referee’s recommended discipline as long as it has a reasonable basis in existing case law and the Florida Standards for Imposing Lawyer Sanctions.
 
 See Fla. Bar v. Temmer,
 
 753 So.2d 555, 558 (Fla.1999). The referee in this case did not cite to any cases or standards in support of the sanction recommendations.
 

 The Bar argues in its cross-petition that the referee’s recommendation of an eighteen-month suspension is unsupported by the Florida Standards for Imposing Lawyer Sanctions and our caselaw and that the suspension should be for three years. We agree and instead impose a three-year suspension.
 

 In support of its argument that a three-year suspension is the appropriate discipline, the Bar cites to standards 4.32 and 7.2, as well as
 
 Florida Bar v. Dunagan,
 
 731 So.2d 1237 (Fla.1999) (suspending attorney for ninety-one days for representing husband in dissolution proceeding after he had represented both husband and wife in connection with various business matters and business was marital asset);
 
 Florida Bar v. Wilson,
 
 714 So.2d 381 (Fla.1998) (suspending attorney for one year for agreeing to represent wife in dissolution proceeding after previously representing couple in unrelated declaratory judgment action and for other misconduct);
 
 Florida Bar v. Hmielewski,
 
 702 So.2d 218 (Fla.1997) (suspending attorney for three years for making deliberate misrepresentations in medical malpractice action despite significant mitigating factors);
 
 Florida Bar v. Calvo,
 
 630 So.2d 548, 549 (Fla.1993) (disbarring attorney for his reckless misconduct with regard to securities offering, including failing to disclose to poten
 
 *318
 
 tial investors that one of principals involved had been indicted for mail fraud);
 
 Florida Bar v. Mastrilli,
 
 614 So.2d 1081 (Fla.1993) (suspending attorney for six months for filing suit against one client on behalf of another client in matter for which attorney had been retained by both of them); and
 
 Feige,
 
 596 So.2d 433 (suspending attorney for two years for representing himself and client when their interests were adverse, despite client’s consent to dual representation).
 

 Standard 4.32 provides that suspension is appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client. Standard 7.2 provides that suspension is appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system. Of course, the standards do not distinguish between suspensions of different lengths. These standards support the referee’s recommendation to the same extent that they support the Bar’s position.
 

 However, if the egregiousness of the conduct is viewed as falling along a continuum, the closer the conduct falls on the continuum to the dividing line between suspension and disbarment, the longer the suspension that such conduct would warrant. In looking at the corresponding standards for disbarment in these same categories, it appears that Scott’s conduct comes close to that dividing line in both cases. Standard 4.31 provides, in pertinent part, that disbarment is appropriate when a lawyer, without the informed consent of the client, simultaneously represents clients that the lawyer knows have adverse interests with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client, or represents a client in a matter substantially related to a matter in which the interests of a present or former client are materially adverse, and knowingly uses information relating to the representation of a client with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client.
 

 Standard 7.1 provides that disbarment is appropriate when a lawyer intentionally engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.
 

 In the case of both standards, it appears that Scott’s conduct falls close to the dividing line on the continuum between disbarment and suspension. This supports the imposition of a suspension close to the dividing line between suspension and disbarment. The maximum length of a definite-term suspension under the Rules Regulating the Florida Bar is three years. R. Regulating Fla. Bar 3-5.1(e).
 

 Feige
 
 is particularly helpful in gauging an appropriate sanction in this case.
 
 Feige
 
 involved a lawyer who engaged in an unwaivable conflict of interest and who failed to inform a third party of noneonfi-dential information under circumstances that allowed his client to perpetrate a fraud on her ex-husband, the third party. Scott engaged in precisely the same kinds of misconduct in this case but to a more egregious extent. This Court suspended Feige for two years. Because Scott’s misconduct was more egregious, it warrants a longer suspension than that imposed in
 
 Feige.
 

 The more recent cases of
 
 Florida Bar v. Head,
 
 27 So.3d 1 (Fla.2010), and
 
 Florida Bar v. Herman,
 
 8 So.3d 1100 (Fla.2009), also involved similar but less egregious misconduct. In
 
 Head
 
 we suspended a law
 
 *319
 
 yer for one year after he created a conflict of interest between himself and his clients by convincing them to pay him $10,000 from the proceeds of a mortgage refinancing when his clients’ primary objective in arranging the mortgage refinancing had been to pay off their biggest creditor and paying the lawyer $10,000 frustrated that objective.
 
 Head,
 
 27 So.3d at 9. In addition, the lawyer was not forthcoming in advising the bankruptcy court in his clients’ case that he had received $10,000 in fees. He also filed a “Suggestion of Bankruptcy” for his firm in his clients’ bankruptcy case when he had not filed a petition for bankruptcy for the firm.
 
 Id.
 
 at 5.
 

 In
 
 Herman
 
 we suspended a lawyer for eighteen months for going into direct business competition with a client of his firm and representing both companies without advising the first client of the conflict or obtaining a waiver.
 
 Herman,
 
 8 So.3d at 1103. We found his failure to inform his first client about his own company was “dishonest and deceitful” and motivated by “monetary concerns.”
 
 Id.
 

 CONCLUSION
 

 Accordingly, William Sumner Scott is hereby suspended from the practice of law for three years and ordered to reimburse the Bar for its costs. The suspension will be effective thirty days from the filing of this opinion so that Scott can close out his practice and protect the interests of existing clients. If Scott notifies this Court in writing that he is no longer practicing and does not need the thirty days to protect existing clients, this Court will enter an order making the suspension effective immediately. Scott shall accept no new business from the date this opinion is filed until he is reinstated by this Court.
 

 Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from William Sumner Scott in the amount of $5,637.71, for which sum let execution issue.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 . Frankel testified before the referee that a forex brokerage company is a currency exchange brokerage company.
 

 [2]
 

 . The agreement reflects that Scott was retained by ICEC on November 30, 1998, but was terminated on December 12, 1998.